## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **JEANNE AUER**, on behalf of herself and all others similarly situated, | No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| **MEDUSIND, INC.,** | |
| Defendant. | |

Jeanne Auer ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Medusind, Inc. ("Medusind" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.      This class action arises from Medusind's failure to protect highly sensitive data.

2.      Medusind is a "medical and dental billing and revenue cycle management company" based in Miami, Florida.[1]

3.      As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") and protected health information ("PHI") (collectively "PII/PHI") about its current and former clients (and their patients or customers). But Defendant lost control over that

---

[1] Medusind Overview, LinkedIn, https://www.linkedin.com/company/medusind/about/ (last visited Jan. 13, 2025).

data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. Upon information and belief, the Data Breach impacted at least 360,934 individuals.[2] And, upon information and belief, the victims of the Data Breach included Defendant's current and former clients (and their patients and customers).

5. Defendant's breach differs from typical data breaches because it affects individuals who had no relationship with Medusind, never sought one, and never consented to Medusind collecting and storing their information.

6. According to Defendant's Breach Notice, on or about December 29, 2023, Defendant discovered that it was the target of a cyberattack. In other words, Medusind had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former clients PII/PHI.

7. On information and belief, cybercriminals were able to breach Medusind's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PHI. In short, Medusind's failures placed the Class's PHI in a vulnerable position—rendering them easy targets for cybercriminals.

8. Plaintiff is a Data Breach victim, having received a breach notice—a copy of Plaintiff's Breach Notice is attached as Exhibit A. She brings this class action on behalf of herself, and all others harmed by Medusind's misconduct.

---

[2] Data Breach Notifications, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/bf4aed39-d2f2-4ce2-bd56-5357107d7f3c.html (last visited Jan. 13, 2025).

9.      The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former clients' (and their patients' and customers') private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10.      Plaintiff, Emily Bennett, is a natural person and citizen of California. She resides in Stockton, California where she intends to remain.

11.      Defendant, Medusind, Inc. is a Florida Profit Corporation with its principal place of business at 6100 Blue Lagoon Drive, Suite 450, Miami, Florida 33126.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Medusind and Plaintiff are citizens of different states. And there are over 100 putative Class members.

13.      This Court has personal jurisdiction over Medusind because it is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida.

14.      Venue is proper in this Court because Medusind's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### *Medusind Collected and Stored the PII/PHI of Plaintiff and the Class*

15.      Medusind touts itself as a "leading medical and dental billing and revenue cycle management company" and boasts that its "unique combination of powerful technology solutions

and client-focused service significantly improves the efficiency and profitability of medical practices, hospitals, dental groups, GPOs and third-party administrators."[3] Defendant has 12 locations throughout the U.S. and India and provides services to more than 6,000 healthcare providers.[4]

16.     As part of its business, Medusind receives and maintains the PII/PHI of thousands of its current and former clients (and their patients and customers).

17.     In collecting and maintaining the PII/PHI, Medusind agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII/PHI.

18.     Under state and federal law, businesses like Medusind have duties to protect its current and former clients' (and their patients' and customers') PII/PHI and to notify them about breaches.

19.     Medusind recognizes these duties, declaring in its "Privacy Policy" that:

  a.     "Medusind wants to assure you of our commitment to privacy and security."

  b.     "Medusind, its subsidiaries and affiliates, or other members of our family of companies value your business and loyalty. We are committed to the protection of your privacy."

  c.     "Medusind makes reasonable efforts to ensure that our Internet Service Providers have implemented physical, electronic, and procedural security measures to assist with safeguarding your personal information, and to help protect against unauthorized access and disclosure."

---

[3] Medusind Overview, LinkedIn, https://www.linkedin.com/company/medusind/about/ (last visited Jan. 13, 2025).
[4] *Id.*

d.      "Only our authorized personnel and our Internet Service Providers who perform legitimate business functions for Medusind are authorized to access your personal information."

e.      "Medusind stores your Personal Information until it is no longer necessary to provide our services, or until you request us to delete your Personal Information."[5]

20.     Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonably cybersecurity safeguards or policies to protect its clients' (and their patients' and customers') PII/PHI or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to clients' (and their patients' and customers') PII/PHI.

**Medusind's Data Breach**

21.     On or about December 29, 2023, "discovered suspicious activity within its IT network" resulting in the exposure of current and former clients' (and their patients' and customers') information, including their:

a.      health insurance and billing information (such as insurance policy numbers or claims/benefits information),

b.      payment information (such as debit/credit card numbers or bank account information),

---

[5] Privacy Policy, Medusind, https://www.medusind.com/medusind-privacy-policy/ (last visited Jan. 13, 2025).

     c.     health information (such as medical history, medical record number, or prescription information),

     d.     government identification (such as Social Security number, taxpayer ID, driver's license, or passport number), and

     e.     other personal information (such as date of birth, email, address, or phone number). Ex. A.

22.     Worryingly, cybercriminals not only accessed PII/PHI but also *stole* this information as suggested by Defendant's statement that "a cybercriminal may have *obtained a copy of certain files* containing your personal information." Ex. A.

23.     Due to the obfuscating nature of Defendant's Breach Notice, it is unclear how long cybercriminals had unfettered access to peruse and exfiltrate PII/PHI before being detected.

24.     And yet, Medusind waited until January 7, 2025, before it began notifying the class—more than an *entire year* after it discovered the Data Breach. Ex. A.

25.     Thus, Medusind kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

26.     And when Medusind did notify Plaintiff and the Class of the Data Breach, Medusind acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, encouraging Plaintiff and the Class to:

     a.     "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your credit reports for any unauthorized or suspicious activity;"

     b.     "review the enclosure that follows this letter for general guidance on how to protect your personal information;"

      c.      "obtain a copy of your credit report;"

      d.      "always remain vigilant for incidents of fraud and identity theft by reviewing bank and payment card account statements and monitoring your credit reports for suspicious or unusual activity and immediately reporting any suspicious activity or incidents of identity theft;" and

      e.      "consider placing a fraud alert on your credit file."[6]

27.      Medusind failed its duties when its inadequate security practices caused the Data Breach. In other words, Medusind's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII/PHI. And thus, Medusind caused widespread injury and monetary damages.

28.      Since the Data Breach, Medusind has declared that it has "implemented enhanced security measures." Ex. A. But this is too little too late. Simply put, these measures—which Medusind now recognizes as necessary—should have been implemented *before* the Data Breach.

29.      On information and belief, Medusind failed to adequately train its employees on reasonable cybersecurity protocols or implement reasonable security measures.

30.      It is unknown how many individuals were impacted by the Data Breach, however upon information and belief, the victims include Medusind's current and former clients (and their patients and customers).

31.      Further, the Notice of Data Breach shows that Medusind cannot—or will not—determine the full scope of the Data Breach, as Medusind has been unable to determine precisely

---

[6] Sample Breach Notice, Office of the Maine Attorney General, https://www.maine.gov/cgi-bin/agviewerad/ret?loc=1735 (last visited Jan. 13, 2025).

when the cybercriminals gained access to its systems, how long they had access, how the breach occurred, and why it took them a year to notified affected individuals.

32.      Medusind has done little to remedy its Data Breach. Medusind has offered victims credit monitoring and identity related services. However, such services are wholly insufficient to compensate Plaintiff and Class members for the injuries that Medusind inflicted upon them.

33.      Because of Medusind's Data Breach, the PII/PHI of Plaintiff and Class members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class members.

34.      Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

35.      And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[7]

36.      Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

*Plaintiff's Experiences and Injuries*

37.      Plaintiff Jeanne Auer is a Data Breach victim having received a Breach Notice.

---

[7] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

38.     Thus, on information and belief Medusind obtained and maintained Plaintiff's PII/PHI.

39.     As a result, Plaintiff was injured by Medusind's Data Breach.

40.     As a condition of receiving services with Defendant, Plaintiff third-party agent provided Medusind with her PII/PHI and allowed them to maintain her PII/PHI. Medusind used her PII/PHI to facilitate its services.

41.     Plaintiff or her third-party agent trusted the company would use reasonable measures to protect her PII/PHI according to Medusind's internal policies, as well as state and federal law. Medusind obtained and continues to maintain Plaintiff's PII/PHI and has a continuing legal duty and obligation to protect that PII/PHI from unauthorized access and disclosure.

42.     Plaintiff reasonably understood that a portion of the funds she or her third-party agent paid for services would be used to pay for adequate cybersecurity and protection of PII/PHI.

43.     Plaintiff received a Notice of Data Breach from Defendant.

44.     Thus, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

45.     Through its Data Breach, Medusind compromised Plaintiff's:

   a.     health insurance and billing information (such as insurance policy numbers or claims/benefits information),

   b.     payment information (such as debit/credit card numbers or bank account information),

   c.     health information (such as medical history, medical record number, or prescription information),

      d.      government identification (such as Social Security number, taxpayer ID, driver's license, or passport number), and

      e.      other personal information (such as date of birth, email, address, or phone number). Ex. A.

46.      Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft and signing up for credit monitoring services. After all, Medusind directed Plaintiff to take those steps in its breach notice.

47.      Plaintiff fears for the security of her PII/PHI and worries about what information was exposed in the Data Breach.

48.      Because of Medusind's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

49.      Plaintiff suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

50.      Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and medical identity theft—all because Medusind's Data Breach placed Plaintiff's PII/PHI right in the hands of criminals.

51.      Indeed, following the Data Breach, Plaintiff was notified that her information was found on the Dark Web.

52.      Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

53.     Today, Plaintiff has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains backed up in Medusind's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

54.     Because of Medusind's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.      loss of the opportunity to control how their PII/PHI is used;

b.      diminution in value of their PII/PHI;

c.      compromise and continuing publication of their PII/PHI;

d.      out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.      lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.      delay in receipt of tax refund monies;

g.      unauthorized use of their stolen PII/PHI; and

h.      continued risk to their PII/PHI—which remains in Medusind's possession—and is thus as risk for futures breaches so long as Medusind fails to take appropriate measures to protect the PII/PHI.

55.     Stolen PII/PHI is one of the most valuable commodities on the criminal information black market.

56.     According to the National Association of Healthcare Access Management, "[p]ersonal medical data is said to be more than ten times as valuable as credit card information. PHI has such a high value because it contains highly sensitive information, such as social security numbers, birth dates, addresses, credit card numbers, telephone numbers and medical conditions. This data is incredibly valuable on the black market because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been stolen."[8]

57.     According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[9]

58.     Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

59.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

60.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year.

---

[8] https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information#:~:text=Personal%20medical%20data%20is%20said,telephone%20numbers%20and%20medical%20conditions, (last visited Jan. 13, 2025).
[9] https://www.ahu.edu/blog/data-security-in-healthcare (last visited Jan. 13, 2025).

2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[10]

61.    Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[11]

62.    The HIPAA Journal article goes on to explain that patient records, like those stolen from Medusind, are "often processed and packaged with other illegally obtained data to create full record sets (the previously mentioned Fullz package) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[12]

63.    Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

64.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[13]

---

[10] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited Jan. 13, 2025).
[11] *Id.*
[12] *Id.*
[13] https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Jan. 13, 2025).

65.     These significant increases in attacks to companies, particularly those in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant Medusind.

66.     A study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[14] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[15]

67.     Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

68.     It is incorrect to assume that reimbursing a victim for a financial loss due to fraud makes that individual whole again. Similar to the GAO's study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[16] In fact, the

---

[14] https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Jan. 13, 2025).
[15] *Id.*
[16] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last visited Jan. 13, 2025).

BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims."[17]

69.    Further, once a patient's medical information is in the hands of thieves, they have access to the individual's health insurance and may use it to obtain free medical care, which can "ruin credit and take months, or even years, to resolve."[18]

70.    As the fraudulent activity resulting from the Data Breach may not come to light for years, Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**Medusind Knew—Or Should Have Known—of the Risk of a Data Breach**

71.    Medusind's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

72.    In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[19]

73.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have

---

[17] *Id.*

[18] https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information#:~:text=Personal%20medical%20data%20is%20said,telephone%20numbers%20and%20medical%20conditions (last visited Jan. 13, 2025).

[19] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

lesser IT defenses and a high incentive to regain access to their data quickly."[20]

74.    Medusind's Data Breach follows a number of high-profile data breaches of US healthcare providers. This includes the Change Healthcare ransomware attack in February, 2024, which has led to more than 100 million Americans' personal data being breached and a ransomware attack on Ascension in May in resulted in 5.6 million individuals having their sensitive personal, medical and financial information breached.[21]

75.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Medusind's industry, including Defendant.

***Medusind Failed to Follow FTC Guidelines***

76.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

77.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[22]  The FTC declared that, *inter alia*, businesses must:

   a.    protect the personal customer information that they keep;

   b.    properly dispose of personal information that is no longer needed;

---

[20] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[21] https://www.infosecurity-magazine.com/news/medusind-breach-patient-data/ (last visited Jan. 13, 2025).

[22] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

    c.      encrypt information stored on computer networks;

    d.      understand their network's vulnerabilities; and

    e.      implement policies to correct security problems.

78.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

79.    Furthermore, the FTC explains that companies must:

    a.      not maintain information longer than is needed to authorize a transaction;

    b.      limit access to sensitive data;

    c.      require complex passwords to be used on networks;

    d.      use industry-tested methods for security;

    e.      monitor for suspicious activity on the network; and

    f.      verify that third-party service providers use reasonable security measures.

80.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.    In short, Medusind's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former clients' (and their patients' and customers') data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Medusind Failed to Follow Industry Standards***

82.     Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

83.     Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

84.     Upon information and belief, Medusind failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

85.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Medusind opened the door to the criminals—thereby causing the Data Breach.

***Medusind Violated HIPAA***

86.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly

known as the Administrative Simplification Rules, establish national standards for electronic

transactions and code sets to maintain the privacy and security of protected health information.[23]

87.     HIPAA provides specific privacy rules that require comprehensive administrative,

physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI and

PHI is properly maintained.[24]

88.     The Data Breach itself resulted from a combination of inadequacies showing

Medusind failed to comply with safeguards mandated by HIPAA. Medusind's security failures

include, but are not limited to:

a.      failing to ensure the confidentiality and integrity of electronic PHI that it
        creates, receives, maintains and transmits in violation of 45 C.F.R. §
        164.306(a)(1);

b.      failing to protect against any reasonably-anticipated threats or hazards to
        the security or integrity of electronic PHI in violation of 45 C.F.R. §
        164.306(a)(2);

c.      failing to protect against any reasonably anticipated uses or disclosures of
        electronic PHI that are not permitted under the privacy rules regarding
        individually identifiable health information in violation of 45 C.F.R. §
        164.306(a)(3);

---

[23] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.
[24] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

  d.    failing to ensure compliance with HIPAA security standards by Medusind's workforce in violation of 45 C.F.R. § 164.306(a)(4);

  e.    failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

  f.    failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

  g.    failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

  h.    failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

  i.    failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

89.   Simply put, the Data Breach resulted from a combination of insufficiencies that demonstrate Medusind failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

90.   Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3),

individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII/PHI was compromised in the Data Breach including all those individuals who received notice of the breach.

91.     Plaintiff also proposes the following subclass ("California Subclass"), to be represented by Plaintiff Jeanne Auer:

> All individuals residing in California whose PII/PHI was compromised in the Data Breach including all those who received notice of the breach.

92.     Together, the Nationwide Class and the California Subclass are referred to as the "Class."

93.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Medusind has a controlling interest, any Medusind officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

94.     Plaintiff reserves the right to amend the class definition.

95.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

96.     <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Medusind's custody and control. After all, Medusind already identified some individuals and sent them data breach notices.

97.     <u>Numerosity</u>. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes at 360,934 members.

98.     <u>Typicality</u>. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

99.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

100.    <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

a.      if Medusind had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

b.      if Medusind failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.      if Medusind were negligent in maintaining, protecting, and securing PII/PHI;

d.      if Medusind breached contract promises to safeguard Plaintiff and the Class's PII/PHI;

e.      if Medusind took reasonable measures to determine the extent of the Data Breach after discovering it;

f.      if Medusind's Breach Notice was reasonable;

g.      if the Data Breach caused Plaintiff and the Class injuries;

h.      what the proper damages measure is; and

i.      if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

101.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against Medusind would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**<u>FIRST CAUSE OF ACTION</u>**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

102.    Plaintiff incorporates by reference paragraphs 1–101 as if fully set forth herein.

103.    Plaintiff and the Class entrusted their PII/PHI to Medusind on the premise and with the understanding that Medusind would safeguard their PII/PHI, use their PHI to provide services only, and/or not disclose their PII/PHI to unauthorized third parties.

104.    Medusind owed a duty of care to Plaintiff and Class members because it was foreseeable that Medusind's failure—to use adequate data security in accordance with industry

standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

105.    Medusind has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

106.    Medusind owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom Medusind knew or should have known would suffer injury-in-fact from Medusind's inadequate security practices. After all, Medusind actively sought and obtained Plaintiff and Class members' PII/PHI.

107.    Medusind owed—to Plaintiff and Class members—at least the following duties to:

  a. exercise reasonable care in handling and using the PII/PHI in its care and custody;

  b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

  c. promptly detect attempts at unauthorized access;

  d. notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII/PHI.

108.    Thus, Medusind owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

109.    Medusind also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

110.     Medusind knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

111.     Medusind's duty to use reasonable security measures arose because of the special relationship that existed between Medusind and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Medusind with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

112.     Under the FTC Act, 15 U.S.C. § 45, Medusind had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII/PHI.

113.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Medusind's duty to protect Plaintiff and the Class members' sensitive PII/PHI.

114.     Medusind violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Medusind's conduct was particularly unreasonable given the nature and amount of PII/PHI Medusind had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

115.     Similarly, under HIPAA, Medusind had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class members' PII/PHI.

116.     Medusind violated its duty under HIPAA by failing to use reasonable measures to protect its PII/PHI and by not complying with applicable regulations detailed *supra*. Here too, Medusind's conduct was particularly unreasonable given the nature and amount of PII/PHI that Medusind collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

117.     The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Medusind hold vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Medusind's databases containing the PII/PHI —whether by malware or otherwise.

118.     PII/PHI is highly valuable, and Medusind knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

119.     Medusind improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

120.     Medusind breached these duties as evidenced by the Data Breach.

121.     Medusind acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII/PHI by:

    a.     disclosing and providing access to this information to third parties and

    b.     failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

122.     Medusind breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

123.     Medusind further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

124.     Medusind has admitted that the PII/PHI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

125.     As a direct and traceable result of Medusind's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

126.     And, on information and belief, Plaintiff's PII/PHI has already been published— or will be published imminently—by cybercriminals on the Dark Web.

127.     Medusind's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Medusind's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract

**(On Behalf of Plaintiff and the Class)**

128.    Plaintiff incorporates by reference paragraphs 1–101 as if fully set forth herein.

129.    Plaintiff and Class members (or their third-party agents) were required to provide their PII/PHI to Medusind as a condition of receiving services provided by Defendant. Plaintiff and Class members provided their PII/PHI to Medusind in exchange for Medusind's services.

130.    Plaintiff and Class members (or their third-party agents) reasonably understood that a portion of the funds they paid Medusind would be used to pay for adequate cybersecurity measures.

131.    Plaintiff and Class members reasonably understood that Medusind would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Medusind's duties under state and federal law and its internal policies.

132.    Plaintiff and the Class members (or their third-party agents) accepted Medusind's offers by disclosing their PII/PHI to Medusind in exchange for services.

133.    In turn, and through internal policies, Medusind agreed to protect and not disclose the PII/PHI to unauthorized persons.

134.    In its Privacy Policy, Medusind represented that they had a legal duty to protect Plaintiff's and Class Member's PII/PHI.

135.    Implicit in the parties' agreement was that Medusind would provide Plaintiff and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

136.    After all, Plaintiff and Class members would not have entrusted their PII/PHI to Medusind in the absence of such an agreement with Defendant.

137.     Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

138.     The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

139.     Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

140.     Medusind materially breached the contracts it entered with Plaintiff and Class members by:

      a.     failing to safeguard their information;

      b.     failing to notify them promptly of the intrusion into its computer systems that compromised such information.

      c.     failing to comply with industry standards;

      d.     failing to comply with the legal obligations necessarily incorporated into the agreements; and

      e.     failing to ensure the confidentiality and integrity of the electronic PII/PHI that Medusind created, received, maintained, and transmitted.

141.     In these and other ways, Medusind violated its duty of good faith and fair dealing.

142.     Medusind's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

143.     And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

144.     Plaintiff and Class members performed as required under the relevant agreements, or such performance was waived by Medusind's conduct.

## THIRD CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiff and the Class)

145.     Plaintiff incorporates by reference paragraphs 1–101 as if fully set forth herein.

146.     Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

147.     Medusind owed a duty to its current and former clients and their patients or customers, including Plaintiff and the Class, to keep this information confidential.

148.     The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII/PHI is highly offensive to a reasonable person.

149.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

150.     The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

151.     Medusind acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

152.     Medusind acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

153.     Acting with knowledge, Medusind had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

154.     As a proximate result of Medusind's acts and omissions, the private and sensitive PII/PHI of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

155.     And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

156.     Unless and until enjoined and restrained by order of this Court, Medusind's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII/PHI are still maintained by Medusind with their inadequate cybersecurity system and policies.

157.     Plaintiff and the Class have no adequate remedy at law for the injuries relating to Medusind's continued possession of their sensitive and confidential records. A judgment for

monetary damages will not end Medusind's inability to safeguard the PII/PHI of Plaintiff and the Class.

158.    In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class members, also seeks compensatory damages for Medusind's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

159.    Plaintiff incorporates by reference paragraphs 1–101 as if fully set forth herein.

160.    This claim is pleaded in the alternative to the breach of implied contract claim.

161.    Plaintiff and Class members (or their third-party agents) conferred a benefit upon Defendant. After all, Medusind benefitted from using their PII/PHI to provide services and benefitted from the payment provided in exchange for services.

162.    Medusind appreciated or had knowledge of the benefits it received from Plaintiff and Class members (or their third-party agents).

163.    Plaintiff and Class members reasonably understood that Medusind would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Medusind's duties under state and federal law and its internal policies.

164.    Medusind enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII/PHI.

165.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Medusind instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures.

Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Medusind's failure to provide the requisite security.

166.    Under principles of equity and good conscience, Medusind should not be permitted to retain the full value of Plaintiff's and Class members' payment because Medusind failed to adequately protect their PII/PHI.

167.    Plaintiff and Class members have no adequate remedy at law.

168.    Medusind should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

### FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

169.    Plaintiff incorporates by reference paragraphs 1–101 as if fully set forth herein.

170.    Given the relationship between Medusind and Plaintiff and Class members, where Medusind became guardian of Plaintiff's and Class members' PII/PHI, Medusind became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and Class members' PII/PHI; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Medusind did and does store.

171.    Medusind has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Medusind's relationship with them—especially to secure their PII/PHI.

172.     Because of the highly sensitive nature of the PII/PHI, Plaintiff and Class members would not have entrusted Defendant, or anyone in Medusind's position, to retain their PII/PHI had they known the reality of Medusind's inadequate data security practices.

173.     Medusind breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII/PHI.

174.     Medusind also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

175.     As a direct and proximate result of Medusind's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SIXTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (UCL)**
**Cal Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

176.     Plaintiff incorporates by reference paragraphs 1-101 as if fully set forth herein.

177.     Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

178.     Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq.* (the "CCPA"), and other state data security laws.

179.     Defendant stored the PII/PHI of Plaintiff and the California Subclass in its computer systems and knew or should have known it did not employ reasonable, industry

standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff's and the California Subclass's PII/PHI secure to prevent the loss or misuse of that PII/PHI.

180.    Defendant failed to disclose to Plaintiff and the California Subclass that their PII/PHI was not secure. However, Plaintiff and the California Subclass were entitled to assume, and did assume, that Defendant had secured their PII/PHI. At no time were Plaintiff and the California Subclass on notice that their PII/PHI was not secure, which Defendant had a duty to disclose.

181.    Defendant also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and the California Subclass's nonencrypted and nonredacted PII/PHI.

182.    Had Defendant complied with these requirements, Plaintiff and the California Subclass would not have suffered the damages related to the data breach.

183.    Defendant's conduct was unlawful, in that it violated the CCPA.

184.    Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

185.    Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

186.    Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting PII/PHI.

187.    Defendant also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g*., Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

188.    Instead, Defendant made the PII/PHI of Plaintiff and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiff and the California Subclass to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

189.    As a result of those unlawful and unfair business practices, Plaintiff and the California Subclass suffered an injury-in-fact and have lost money or property.

190.    For one, on information and belief, Plaintiff's and the California Subclass's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the dark web.

191.    The injuries to Plaintiff and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

192.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

193.    Therefore, Plaintiff and the California Subclass are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**Violations of the California Consumer Privacy Act ("CCPA")**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiff and the California Subclass)**

194.    Plaintiff incorporates by reference paragraphs 1-101 as if fully set forth herein.

195.    Defendant violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted PII of Plaintiff and the California Subclass. As a direct and proximate result, Plaintiff's and the California Subclass's nonencrypted and nonredacted PII was subject to unauthorized access and exfiltration, theft, or disclosure.

196.    Defendant is a "business" under the meaning of Civil Code § 1798.140 because Defendant is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code § 1798.140(d).

197.    Plaintiff and California Subclass Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards PII/PHI by implementing

reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold PII/PHI, including Plaintiff's and California Subclass members' PII/PHI. Plaintiff and California Subclass members have an interest in ensuring that their PII/PHI is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

198.    Pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendant's registered service agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. If Defendant cannot cure within 30 days— and Plaintiff believes such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

199.    As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

200.    A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

### EIGHTH CAUSE OF ACTION
**Violation of the California Consumer Records Act**
**Cal. Civ. Code § 1798.80,** *et seq.*
**(On Behalf of Plaintiff and the California Subclass)**

201.    Plaintiff incorporates by reference paragraphs 1-101 as if fully set forth herein.

202.    Under the California Consumer Records Act, any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" must "disclose any breach of the system following discovery or

notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82. The disclosure must "be made in the most expedient time possible and without unreasonable delay" but disclosure must occur "immediately following discovery [of the breach], if the personal information was, *or* is reasonably believed to have been, acquired by an unauthorized person." *Id* (emphasis added).

203.    The Data Breach constitutes a "breach of the security system" of Defendant.

204.    An unauthorized person acquired the personal, unencrypted information of Plaintiff and the California Subclass.

205.    Defendant knew that an unauthorized person had acquired the personal, unencrypted information of Plaintiff and the California Subclass but has still not yet notified victims. Given the severity of the Data Breach, this is an unreasonable delay.

206.    Defendant's unreasonable delay prevented Plaintiff and the California Subclass from taking appropriate measures from protecting themselves against harm.

207.    Because Plaintiff and the California Subclass were unable to protect themselves, they suffered incrementally increased damages that they would not have suffered with timelier notice.

208.    Plaintiff and the California Subclass are entitled to equitable relief and damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Plaintiff and Class members respectfully request judgment against Medusind and that the Court enter an order:

A.     Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.     Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.     Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.     Enjoining Medusind from further unfair and/or deceptive practices;

E.     Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.     Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.     Awarding attorneys' fees and costs, as allowed by law;

H.     Awarding prejudgment and post-judgment interest, as provided by law;

I.     Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.     Granting other relief that this Court finds appropriate.


### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: January 14, 2025

Respectfully submitted,

**SHAMIS & GENTILE P.A.**
<u>/s/ Andrew Shamis</u>
Andrew J. Shamis, Esq.
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Tel: (305) 479-2299


By: <u>/s/ Raina Borrelli</u>
Raina Borrelli*
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com
*Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*